**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| Colby William Crosby *as the Personal Representative of the Estate of William Jerry Crosby*, | Case No. 2:22-cv-03897-RMG |
| Plaintiff, | |
| v. | **ORDER AND OPINION** |
| Colleton County Sheriff's Office; Sheriff Guerry Buddy Hill *in his Official Capacity*; and Jacob Scott *Individually*, | |
| Defendants. | |

This matter comes before the Court on the Parties' cross motions for summary judgment. Defendants moved for summary judgment on all claims, Plaintiff opposed the motion, and Defendants replied. (Dkt. Nos. 25, 32, 37). Plaintiff moved for summary judgment on a single claim, Defendants opposed the motion, and Plaintiff replied. (Dkt. Nos. 27, 31, 35). For the reasons set forth below, the Court grants in part and denies in part Defendants' motion for summary judgment (Dkt. No. 25) and denies Plaintiff's motion for summary judgment (Dkt. No. 27).

I. **Background**

On May 1, 2022, Donna Crosby called 911 to request a welfare check for her husband, Jerry Crosby. (Dkt. Nos. 25 at 2; Dkt. No. 27 at 2). During the call, the 911 dispatcher transcribed the following notes:

> C[ALLER] IS REQ[UESTING] A WELFARE CHECK ON HER HUSBAND
> SHE ADV[ISED] AROUND 5-530 HE SAID HE WOULD HARM HIMMSELF [sic]
> C[ALLER] ADV[ISED] HE HAS SAID THIS BEFORE IN THE PAST
> C[ALLER] ADV[ISED] HE HASN'T BEEN HIMSELF LATELY
> RES[IDENCE] IS LARGE 2 STORY RIVER HOUSE BROWN IN COLOR W CREME TRIM
> SUSP[ECT] DRIVES A WHITE GMC TRUCK
> SHE ADV[ISED] THE NEIGHBOR ADDRESS IS 341 PERKINS PATH
> HIS HOUSE IS ON THE RIVER

1

C[ALLER] ADV[ISED] EARLIER TODAY HE LEFT TO GO TO THE RIVER

(Dkt. No. 25-2 at 3). Defendant Jacob Scott ("Officer Scott") responded to Mrs. Crosby's welfare check request, and, as he drove to Mr. Crosby's river house ("the residence"), his only information was limited to the notes transcribed by the 911 dispatcher. (Dkt. No. 25 at 2; Dkt. No. 27 at 3).

As Officer Scott arrived at the residence, he observed the white truck referenced in the 911 dispatcher's notes parked in the yard. (Officer Scott Body Worn Camera at 3:50). Officer Scott walked directly to the first door on the lower level of the two-story residence and knocked. (*Id.* at 4:33-35). During the next minute and thirty-three seconds, Officer Scott knocked on this door three times without a response from within. (*Id.* at 4:33-6:06).

After leaving the first door on the lower level of the residence after three unsuccessful attempts to contact Mr. Crosby, Officer Scott approached a screened-in room[1] toward the rear of the residence. Officer Scott did not see or hear anyone inside. (*Id.* at 6:15). He then approached an upstairs screened-in room by an external staircase and knocked but did not hear or see anyone inside. (*Id.* at 6:58). He then walked back to his vehicle. (*Id.* at 7:16). Throughout this investigation, Officer Scott could hear a dog barking inside the residence. (*Id.* at 6:06-7:16).

After retrieving a flashlight from his vehicle and confirming that Mr. Crosby was not inside of the white truck (*id.* at 7:16-9:14), Officer Scott reapproached the residence (*id.* at 9:28). The dog began to bark again. (*Id.* at 9:34). Officer Scott approached the lower-level screened-in room and knocked on the door. (*Id.* 9:36-39). Then, Officer Scott approached the upstairs screened-in room (*id.* at 11:06); shined his flashlight into the room (*id.* at 11:06-19); opened the screen door

---

[1] The Court assumes, without deciding, that the screened-in area, referenced as a patio, porch, and room, is part of the home. The Parties briefed whether this area is part of the home or is more appropriately considered curtilage. Since the Court's ruling does not depend on whether the screened-in room is part of the home or is curtilage, the Court assumes it is part of the home.

2

(*id.* at 11:36); and entered the room (*id.* at 11:40). Upon entering the room, Officer Scott walked to a glass door that separated the outdoor room from the interior of the residence and knocked twice. (*Id.* at 11:55-58, 12:29-31). Officer Scott waited approximately thirty seconds and, with the bottom end of his flashlight knocked a third time. (*Id.* at 13:03-07). The dog continued barking. (*Id.*).

Having received no responses from his repeated efforts to make contact with Mr. Crosby, Officer Scott walked back to the first door on the lower level of the home, the same door that he knocked on upon his arrival at the residence approximately ten minutes earlier. (*Id.* at 14:06). Officer Scott slowly opened the unlocked door (*id.* at 14:09) and announced himself: "Sheriff's Office," (*id.* at 14:10). Leaning into the room and scanning it with his flashlight, Officer Scott learned that this door opened onto a bedroom. (*Id.* at 14:15-20). Seeing no one inside, Officer Scott closed the door. (*Id.* at 14:21).

Officer Scott entered a different portion of the residence in a similar fashion. Relevant here, during the next two entries, Officer Scott, with the bottom end of his flashlight, knocked four times (*id.* at 14:45-47, 14:57-59, 15:51-53, 15:56-59); announced himself four times (*id.* at 15:10, 15:20, 15:32, and 15:56); and slid open two side-by-side doors and scanned the rooms (*id.* at 15:03, 15:55).

Having still been unable to make contact with Mr. Crosby, Officer Scott returned to the downstairs screened-in room, but this time he announced himself and entered. (*Id.* at 17:24-26). Surveying the room with his flashlight, Officer Scott approached an open note pad and pored over what was written. (*Id.* at 17:37-57). Moments later, he reported to a second officer, who had just arrived, "It looks like I have a suicide note on the patio. We just can't get to one room until we

3

get this dog secured . . . I think he's upstairs in the bedroom.  I can see something in the bedroom, but I got to do something with this dog."  (*Id.* at 18:23-49).

Officer Scott returned to the upstairs screened-in room and entered the residence through a glass door that opened onto a living area.  (*Id.* at 20:38).  Officer Scott entered the living area and noticed a bedroom with a light on at the end of the hallway.  As he walked into the living area, the barking dog ran away from him.  (*Id.* at 20:40-43).

With his weapon drawn, Officer Scott walked down the hallway toward the lighted room and announced, "Sheriff's office."  (*Id.* at 21:09).  Three seconds later,

> Jerry Crosby: "What can I do for you?"
> Officer Scott: "Where you at man?"
> Officer Scott: "This is Sheriff's office. Are you okay?"
> Officer Scott: "What was that? Are you okay?"
> Jerry Crosby: "I'm fine."

(*Id.* at 21:12-21:24).  During this initial exchange, Officer Scott was still walking toward the bedroom.  Once Officer Scott approached the open door to the bedroom, he saw Mr. Crosby for the first time, lying in his bed.  The dialogue continued:

> Officer Scott: "Someone called in about you."
> Jerry Crosby: "Well, get the hell out of my home."
> Officer Scott: "Okay. What's going on?"
> Jerry Crosby: "Get the hell out of my home."
> Officer Scott: "I got to make sure you're okay. Have you taken any
>                 pills or anything like that?"
> Jerry Crosby: "What do you want me to do?"
> Officer Scott: "Can you come out and talk to me real quick?"
> Jerry Crosby: "Get the hell out of my home."
> Officer Scott: "We got to check on you."
> Jerry Crosby: "Get out of my home."
> Officer Scott: "We have to check on you."
> Jerry Crosby: "Get out of my home."
> Officer Scott: "Okay. We're here for health and welfare. All I got to
>                 do is check on you."
> Jerry Crosby: "Get out of my home."
> Officer Scott: "Are you trying to hurt yourself?"

4

> Jerry Crosby: "Get out of my home."
> Officer Scott: "I'm not going to leave this door. So, we just either got to just go outside and talk and we can just handle this."

(*Id.* at 21:24-22:03).

The next ten seconds passed in an instant. Mr. Crosby rose from the bed and walked toward Officer Scott, who began to back up. (*Id.* at 22:05-08). Mr. Crosby: "Get out of my home." (*Id.* at 22:06). Officer Scott: "Okay." (*Id.*). Tragically, Mr. Crosby then leaned into the bedroom closet and retrieved a rifle. (*Id.* at 22:10). Officer Scott:

> Don't! No! No! No! No! No! No! No! No! No! No! No! No! No! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't! Don't!

(*Id.* at 22:10-13). While shouting these commands, Officer Scott raised his firearm. (*Id.*). Mr. Crosby retrieved the rifle. Secured it with two hands and pointed it at Officer Scott. Still backing down the hallway, Officer Scott fired four rounds from his firearm and then retreated down the hallway into the living area. (*Id.* at 22:15). Mr. Crosby died from his injuries, and this lawsuit followed.

Plaintiff brings eight causes of action: (1) unlawful entry in violation of the Fourth Amendment under 42 U.S.C. § 1983 against Officer Scott; (2) excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983 against Officer Scott; (3) negligence, gross negligence, and recklessness pursuant to the South Carolina Tort Claims Act ("SCTCA") against Defendants Colleton County Sheriff's Office ("Sheriff's Office") and Sheriff Guerry Buddy Hill ("Sheriff Hill"); (4) battery against all Defendants; (5) negligent hiring, negligent supervision, negligent training, and negligent retention pursuant to the SCTCA and common law against the Sheriff's Office and Sheriff Hill; (6) municipal liability, official capacity liability, and *Monell* liability pursuant to 42 U.S.C. § 1983 against the Sheriff's Office and Sheriff Hill; (7) survival

5

pursuant to the SCTCA, statutory law, and common law against all Defendants; and (8) wrongful death pursuant to SCTCA, statutory law, and common law against all Defendants.  (Dkt. No. 1-1).

Defendants moved for summary judgment on all claims, Plaintiff opposed the motion, and Defendants replied.  (Dkt. Nos. 25, 32, 37).  Plaintiff moved for summary judgment on a single claim: unlawful entry under 28 U.S.C. § 1983, Defendants opposed the motion, and Plaintiff replied.  (Dkt. Nos. 27, 31, 35).  This matter is ripe for the Court's review.

## II.    Legal Standard

To prevail on a motion for summary judgment, the movant must demonstrate that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In addressing a motion for summary judgment, the Court must interpret all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold*, 369 U.S. 654, 655 (1962).  Where the moving party has met its burden to put forth sufficient facts to demonstrate that there is no genuine dispute of material fact, the non-moving party must come forth with "specific facts showing that there is a genuine issue for trial."  *Matshushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case.  *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).  An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

III.    **Discussion**

    A.    **Plaintiff's claim of unlawful entry in violation of the Fourth Amendment under 42 U.S.C. § 1983 against Officer Scott**

"The most basic principle of Fourth Amendment jurisprudence . . . is that warrantless searches and seizures inside a home are presumptively unconstitutional." *United States v. Yengel*, 711 F.3d 392, 396 (4th Cir. 2013) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City*, 547 U.S. at 40 (quoting *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999)). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Id.* "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (quotations and citations omitted). This is known as the emergency aid exception to the warrant requirement.

To invoke the emergency aid exception to the warrant requirement, the officer "making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992). "An objectively reasonable belief must be based on specific articulable facts and reasonable inferences that could have been drawn therefrom." *Yengel*, 711 F.3d at 397.

The issue before the Court is whether it was objectively reasonable for Officer Scott to believe that an emergency existed that required immediate entry to render assistance or prevent harm to Mr. Crosby. Defendants argue that "the objective circumstances at the time of Scott's entry into Crosby's home would cause a reasonable officer to believe that there was an emergency

7

requiring prompt entry." (Dkt. No. 25 at 8). Plaintiff argues that "no reasonable officer would believe exigent circumstances existed requiring or justifying a warrantless entry into the home." (Dkt. No. 32 at 15). The Court finds that Officer Scott had an objectively reasonable basis to believe that Mr. Crosby might have or would made an attempt on his life and that Officer Scott's prompt entry into the home could preserve Mr. Crosby's life.

First, the nature of the 911 call was concerning. Upon arriving at the residence, Officer Scott was aware of the following: Mr. Crosby's wife requested the welfare check; Mr. Crosby threatened to harm himself that same day; Mr. Crosby left to come to the residence that day, an isolated location on the river; Mr. Crosby has threatened to harm himself before in the past; and Mr. Crosby was reported by his wife not to have been himself lately. (Dkt. No. 25 at 2; Dkt. No. 27 at 2-3). These were the objective facts that a reasonable officer could rely upon to conclude that Mr. Crosby was at high risk to do harm to himself.

Second, when Officer Scott arrived, he observed the white GMC truck that Mr. Crosby's wife reported in the 911 call. Accordingly, a reasonable officer on the scene would have an objective basis to believe that the man who might harm himself was on the property. Before entering the home, Officer Scott retrieved a flashlight and quickly looked through the windows of the vehicle and did not see Mr. Crosby in the car. Therefore, he had an objective basis to believe that Mr. Crosby was in the residence.

Third, the incessant barking by the dog, with no effort to quiet the dog, and the lack of a response to the numerous knockings would give a reasonable officer additional concern that an emergency situation existed. Before entering the residence, Officer Scott knocked on several doors. He announced himself repeatedly. While he waited, he walked around the residence. The absence of any response to Officer Scott's many efforts to make contact with Mr. Crosby provided

8

an additional reasonable basis to believe exigence circumstances existed that required him to enter the residence to confirm the status of Mr. Crosby.

Plaintiff argues that Mr. Crosby's "exercise of his own rights is not evidence of distress or emergency and cannot be a valid basis for Scott's entry into the home." (Dkt. No. 32 at 16). For example, Plaintiff argues that Mr. Crosby had a constitutional right to stay in bed when someone knocks on his door and a constitutional right to let his dog bark. This argument begs the question, however. Officer Scott did not know whether Mr. Crosby was exercising his right to ignore the door—or whether he was about to or had already attempted to commit suicide. Objectively, there was no evidence that Mr. Crosby was exercising any of his rights. Instead, Officer Scott had a reasonable basis to believe that Mr. Crosby was present in the residence and was at a high risk for personal harm.

Police officers violate the Fourth Amendment when, by invading the privacy of the home, they unreasonably violate the right of the people to be secure in their home. However, "police officers may enter a home without a warrant in circumstances where they are reasonably trying to prevent a potential suicide . . . " *Caniglia v. Strom*, 141 S. Ct. 1596, 1603 (2021) (Kavanaugh, J., concurring). In other words, it is not unreasonable for an officer to enter a home when he has an objective basis to believe he can prevent a potential suicide or save someone who has attempted suicide. This is the very situation which Officer Scott confronted.

Accordingly, the Court finds Officer Scott's entry was constitutional because he had an objectively reasonable basis to believe that entering might save Mr. Crosby from self-harm. Thus, the Court grants Defendants' motion for summary judgment on Plaintiff's claim for unlawful entry under § 1983 and denies Plaintiff's motion for summary judgment of unlawful entry.

9

**B.** **Plaintiff's claim of excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983 against Officer Scott**

A claim that a law enforcement officer has "used excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), its proper application "requires careful attention to the facts and circumstances of each particular case," including "whether the suspect poses an immediate threat to the safety of the officers or others," as well as "the severity of the crime at issue" and whether the suspect "is actively resisting arrest or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396.

"Where deadly force has been used, the *Graham* factor of whether the suspect posed an immediate threat 'is particularly important.'" *Aleman v. City of Charlotte*, 80 F.4th 264, 285 (4th Cir. 2023) (quoting *Franklin v. City of Charlotte*, 64 F.4th 519, 531 (4th Cir. 2023)). In deadly force cases, like the one here, the Fourth Circuit asks "whether a reasonable officer on the scene would have had 'probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). "[T]he reasonableness of an officer's actions is determined based on the information possessed by the officer at the moment that force is employed." *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005).

Since deadly force was used in this case, "the *Graham* factor of whether [Mr. Crosby] posed an immediate threat 'is particularly important.'" *Aleman*, 80 F.4th at 285 (citations omitted). Furthermore, this factor is to be analyzed "at the moment force [was] employed." *Waterman*, 393

10

F.3d at 477.  At the moment force was employed, Mr. Crosby appeared poised to kill Officer Scott. Mr. Crosby rose out of the bed *to retrieve* a firearm, ignored Officer Scott's commands, and pointed a rifle at Officer Scott.  "No citizen can fairly expect to draw a gun on police without risking tragic consequences.  And no court can expect any human being to remain passive in the face of an active threat on his or her life."  *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996).

The other *Graham* factors—the severity of the crime at issue and whether the suspect is actively resisting arrest or attempting to evade arrest by flight—are not particularly germane to the Court's analysis here since Officer Scott was conducting a welfare check and Mr. Crosby did not seek to leave.

Plaintiff argues that the existence of genuine issues of material fact make summary judgment inappropriate.  (Dkt. No. 32 at 18–21).  Plaintiff argues that there is a factual dispute about whether Mr. Crosby "handled the snake gun in a threatening manner" and whether Mr. Crosby could "readily discern who was standing in his bedroom doorway claiming to be the 'Sheriff's Office.'"  (*Id.* at 20–21).  Plaintiff also argues that a handful of Fourth Circuit cases supports his argument.

First, Plaintiff relies on *Knibbs v. Momphard*, 30 F.4th 200 (4th Cir. 2022).  In *Knibbs*, the Fourth Circuit found that there were genuine issues of material fact where the parties disputed: whether a firearm was aimed at the deputy; whether the victim made any furtive movements toward the deputy "that would indicate his intent to cause physical harm"; and whether the deputy "was readily recognizable as a law enforcement officer in the middle of the night on Knibbs' unlit porch."  *Id.* at 217.

The case before the Court is much different from *Knibbs*.  Importantly, in *Knibbs*, the victim retrieved a firearm when he heard someone outside of his home.  *Id.* at 214.  The Court

11

reasoned that he had a right to protect himself when faced with an unknown threat outside of his home. Here, however, Mr. Crosby retrieved a firearm *while* in conversation with a police officer who told him he was there to conduct a welfare check and who was readily identifiable as a police officer. Mr. Crosby got out of bed, told Officer Scott to leave his home, retrieved a firearm, and then pointed it at Officer Scott. The disputed facts that the *Knibbs* Court found material are absent here.

Second, Plaintiff relies on *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013). In *Cooper*, the Fourth Circuit held that "the facts fail to support the proposition that a reasonable officer would have had probable cause to feel threatened by Cooper's actions." *Id.* at 159. There, "[w]hen the Officers fired on Cooper, [Cooper] stood at the threshold of his home, holding the shotgun in one hand, with its muzzle pointed at the ground. He made no sudden moves. He made no threats. He ignored no commands." *Id.* Furthermore, in *Cooper*, "the Officers never identified themselves" nor was the victim "aware that two sheriff deputies were outside." *Id.* at 160.

The case before the Court is much different from *Cooper*. As explained above, Mr. Crosby did not have a firearm when Officer Scott found him, unlike the victim in *Cooper.* Mr. Crosby made a sudden movement to retrieve a firearm, ignoring Officer Scott's commands. Then, Mr. Crosby pointed the firearm at Officer Scott.

Third, Plaintiff relies on *Betton v. Belue*, 942 F.3d 184 (4th Cir. 2019). In *Betton*, the Fourth Circuit held that an officer's use of force was unreasonable where "Officer Belue shot Betton, who was holding a firearm 'down,' without first identifying himself as a member of law enforcement or giving any commands to Betton." *Id.* at 192. The Fourth Circuit held that "Officer Belue's failure to employ any of these protective measures rendered his use of force unreasonable." *Id.* at 194.

12

The case before the Court is much different from *Betton*. Officer Scott employed the protective measures that were absent in *Betton*. As he walked down the hallway, he announced, "Sheriff's office." Upon meeting Mr. Crosby, he told him he was there for welfare and safety. Mr. Crosby knew he was talking to a police officer. Officer Scott also gave Mr. Crosby commands; which were ignored.

Like the cases that Plaintiff rely upon, the Court asks one dispositive question: whether "the officer ha[d] probable cause to believe that [a] suspect pose[d] a threat of serious physical harm, either to the officer or to others." *Tennessee*, 471 U.S. at 11. As the Court has already stated, "[b]ecause the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell*, 441 U.S. at 559, its proper application "requires careful attention to the facts and circumstances of each particular case," *Graham*, 490 U.S. at 396.

The Court finds, after viewing the facts and inferences from those facts in a light most favorable to Plaintiff as the non-moving party, that Officer Scott had a reasonable basis and probable cause to believe that Mr. Crosby posed a deadly threat to him when Mr. Crosby angrily retrieved a firearm from his bedroom closet and aimed it directly at the officer. No reasonable jury could find otherwise.

Plaintiff suggests that there is a factual dispute over whether Mr. Crosby believed that Officer Scott was a law enforcement officer. On summary judgment, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)). As Defendants observe, Mr. Crosby's words or tone of voice are not those a man greeting a trespasser or a man defending his home, and no reasonable jury would find as such.

13

Finally, it is noteworthy that Plaintiffs' experts testified that Officer Scott's use of force comported with generally accepted police practices. Seth Stoughton and Jeffrey Noble are Plaintiff's experts on issues of police practices, police policy and procedure, police training, and constitutional guarantees. (Dkt. No. 19 at 1). Mr. Stoughton testified, "Accepting as true the hypothetical that the officer had legal course of entry into the home. Then I do not see any deviations from generally accepted practices with regard to the tactics or use of force itself." (Dkt. No. 25-10 at 4). Mr. Noble testified, "So, if – if your hypothetical is that you're assuming that he lawfully entered the home and made contact, if he was lawfully there, no, there was nothing. The use of force was – would have been consistent with generally accepted police practices." (Dkt. No. 25-9 at 4).

Accordingly, the Court finds Officer Scott's use of force constitutionally reasonable under the Fourth Amendment. Thus, the Court grants Defendants' motion for summary judgment on Plaintiff's claim for excessive force under § 1983.

## C. Officer Scott is entitled to qualified immunity.

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). In determining whether an officer is entitled to qualified immunity, the Court asks "whether a constitutional violation occurred" and "whether the right violated was clearly established." *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). "Courts possess discretion concerning which prong to address first;" however, "[i]f the answer to either question is 'no,' the officer being sued is entitled to qualified immunity." *Aleman*, 80 F.4th at 284.

14

The Court has already determined that Officer Scott's entry into the residence and use of force were constitutionally reasonable.  Assuming, however, that Officer Scott's entry and use of force was unconstitutional, the Court will consider "whether the right violated was clearly established," *Melgar*, 593 F.3d at 353, in order to determine whether Officer Scott is entitled to qualified immunity.

"In assessing whether a right was clearly established, we look to decisions of the Supreme Court and [the Fourth Circuit] to 'consider whether officers within our jurisdiction have been provided fair warning, with sufficient specificity, that their actions would constitute a deprivation of an individual's constitutional rights.'" *Aleman*, 80 F.4th at 295 (quoting *Betton*, 942 F.3d at 193–94)).  "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (quotations and citations omitted).

### 1. Officer Scott is entitled to qualified immunity on Plaintiff's unlawful entry claim.

Here, the question is whether it was clearly established in May 2022 that an officer would contravene the Fourth Amendment by entering a home to conduct a welfare check on an occupant whose wife informed the police that he threatened to harm himself and the officer has unsuccessfully attempted to contact the occupant without entering the home and has a reasonable basis to believe that the occupant is in the home.  The Court finds that it would not be clear to a reasonable officer that entering a home in this situation is unlawful.

The Supreme Court has made clear that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (quotations and citations omitted).  *See*

15

*Brigham City,* 547 U.S. at 403 ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury.").  Furthermore, in a concurring opinion, Justice Kavanaugh recently explained, "police officers may enter a home without a warrant in circumstances where they are reasonably trying to prevent a potential suicide . . . " *Caniglia v. Strom,* 141 S. Ct. 1596, 1603 (2021) (Kavanaugh, J., concurring).  In the same case, Chief Justice Roberts also concurred, "[a] warrant to enter a home is not required . . . when there is a 'need to assist persons who are seriously injured or threatened with such injury.'" *Id.* at 1600. (Roberts, C.J., concurring) (quoting *Brigham City v. Stuart,* 547 U.S. 398, 406 (2006))  In short, the Supreme Court has consistently counseled that a warrant is not required when an officer objectively and reasonably believes there is a need to assist someone who might be seriously injured.  This is precisely the situation in which Officer Scott found himself.

In light of the clearly established law, a reasonable officer could believe that his actions in entering the residence were lawful.  *Henry*, 652 F.3d at 531.  Accordingly, the Court finds that Officer Scott is entitled to qualified immunity on Plaintiff's claim for unlawful entry in violation of the Fourth Amendment.

### 2. Officer Scott is entitled to qualified immunity against Plaintiff's excessive force claim.

Here, the question is whether it was clearly established in May 2022 that an officer would contravene the Fourth Amendment by using deadly force against a suspect who, in a heated discussion, retrieves a firearm, ignores an officer's commands to stop, and points the firearm toward the officer.  The Court finds that it would not be clear to a reasonable officer that using deadly force in this situation is unlawful.

When determining that Officer Scott's use of force was constitutionally reasonable, the Court reviewed the authoritative cases on which Plaintiff relies: *Knibbs v. Momphard*, 30 F.4th

200 (4th Cir. 2022); *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013); and *Betton v. Belue*, 942 F.3d 184 (4th Cir. 2019). The Court found that each of these cases, while involving an officer using deadly force, involved materially different facts from the case before the Court and would not provide clear notice to Officer Scott that his actions were unlawful.

For example, in *Knibbs*, *Cooper*, and *Betton*, the victims all possessed a firearm before they interacted with law enforcement. In this case, Mr. Crosby went to retrieve a firearm *while* talking to Officer Scott. *Knibbs*, *Cooper*, and *Betton* provide no guidance here. Furthermore, in *Knibbs*, *Cooper*, and *Betton*, the victims did not make threatening movements or assume positions that would indicate an intent to cause harm. In this case, however, Mr. Crosby rose out of bed, said "Get out of my home," retrieved a firearm, and then pointed it at Officer Scott. *Knibbs*, *Cooper*, and *Betton* provide no guidance here.

In deadly force cases, like the one here, the Fourth Circuit asks "whether a reasonable officer on the scene would have had 'probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Aleman*, 80 F.4th at 285 (quoting *Tennessee*, 471 U.S. at 11. The Court found that a reasonable officer on the scene would have had probable cause to believe that Mr. Crosby posed a threat of serious physical harm to the officer.

In light of the clearly established law, a police officer could have reasonably believed under the facts and circumstances present that his use of force was reasonable, necessary, and lawful. *Henry*, 652 F.3d at 531. Accordingly, the Court finds that Officer Scott is entitled to qualified immunity on Plaintiff's claim for excessive force in violation of the Fourth Amendment.

**D. Municipal liability, official capacity liability, and *Monell* liability pursuant to 42 U.S.C. § 1983 against the Sheriff's Office and Sheriff Hill**

Municipalities qualify as "persons" under 28 U.S.C. § 1983, rendering them amenable to suit. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). "Although

municipalities, unlike public officials, cannot claim immunity from suit, the Supreme Court has expressly cabined their liability: under *Monell*, a municipality is liable only for its own illegal acts." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014). "[A] municipality is liable under § 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Id.* While Plaintiff asserts this claim as municipal liability, official capacity liability, and *Monell* liability, these all refer to a single cause of action: an official-capacity suit, otherwise known as a *Monell* claim. *See Burgos v. City of Philadelphia*, 270 F. Supp. 3d 788, 796 (E.D. Pa. 2017) ("In an official-capacity suit, also known as *Monell* claim, the entity's policy or custom must have played a part in the violation of federal law.") (quotations and citations omitted).

"The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020). The Court finds that the Sheriff's Office and Sheriff Hill are entitled to summary judgment on Plaintiff's *Monell* claim because the Court has already found that Mr. Crosby was not deprived on any constitutional rights. *See, e.g., Howerton v. Fletcher*, 213 F.3d 171, 175 n.5 (4th Cir. 2000) *(*finding that "a municipality cannot be held liable under section 1983 for inadequate training where individuals subject to the training program at issue did not violate the plaintiff's constitutional rights"); *Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 420 (4th Cir. 1996) (finding that "[i]n the absence of any underlying use of excessive force against Wilson, liability cannot be placed on either the non-shooting officers, a supervisor, or the City").

Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiff's claim for municipal liability, official capacity liability, and *Monell* liability pursuant to 42 U.S.C. § 1983 against the Sheriff's Office and Sheriff Hill.

**E. The Court remands the remaining state law claims back to the state court.**

The only claims remaining before the Court are Plaintiff's claims under South Carolina state law. "Subject-matter jurisdiction cannot be conferred by the parties, nor can a defect in subject-matter jurisdiction be waived by the parties." *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004). "Accordingly, questions of subject-matter jurisdiction may be raised at any point during the proceedings and may (or, more precisely, must) be raised *sua sponte* by the court." *Id.*

The court addressed Plaintiff's § 1983 claims pursuant to this Court's federal question jurisdiction. The Court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The only claims remaining are five claims arising under South Carolina state law. Because the Court has neither federal question nor diversity jurisdiction[2] over the state law claims, the Court's supplemental jurisdiction under 28 U.S.C. § 1367(a) is the only basis for federal jurisdiction.

Under 28 U.S.C. § 1367(a), "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they

---

[2] "[D]iversity jurisdiction does not exist unless each defendant is a citizen of a different State from each plaintiff." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978). Here, Plaintiff alleged, and Defendants did not challenge, that Plaintiff opened Mr. Crosby's estate in South Carolina and that Mr. Crosby was a resident of South Carolina. (Dkt. No. 1-1 at ¶ 1). Furthermore, Plaintiffs alleged, and Defendants did not challenge, that the Sheriff's Office is a political subdivision of South Carolina; that Sheriff Hill (in his official capacity) is the publicly elected sheriff for Colleton County, South Carolina, and that Officer Scott is a resident of South Carolina. (*Id.* at ¶¶ 2-5). Complete diversity is clearly lacking.

form part of the same case or controversy under Article III of the United States Constitution."

Furthermore, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim

under subsection (a) if . . . the district court has dismissed all claims over which it has original

jurisdiction." 28 U.S.C. § 1367(c). "[T]rial courts enjoy wide latitude in determining whether or

not to retain jurisdiction over state claims when all federal claims have been extinguished."

*Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). "Among the factors that inform this

discretionary determination are convenience and fairness to the parties, the existence of any

underlying issues of federal policy, comity, and considerations of judicial economy." *Id.*

The Court declines to exercise it supplemental jurisdiction over the pendant state law

claims. While it might be more convenient for the Parties to remain in this forum, the Court finds

that underlying issues of comity and considerations of judicial economy weigh in favor of

remanding the remaining claims to state court. Plaintiff has five state law claims remaining, many

of which are broadly pled, relying on South Carolina common law and statutory law. The "relative

expertise of state courts on matters of state law" also weighs in favor of remand. *Role Models*

*Am., Inc. v. Penmar Dev. Corp.*, 394 F. Supp. 2d 121, 136 (D.D.C. 2005).

To the extent that there are state law claims that are not properly before the Court pursuant

to its supplemental jurisdiction, 28 U.S.C. 1441(c) requires district courts to sever and remand

those state law claims. In other words, "state-law claims falling outside both the original and the

supplemental jurisdiction of federal courts" must be severed and sent back to state court. *Home*

*Depot U. S. A., Inc. v. Jackson*, 139 S. Ct. 1743, 1753 (2019) (Alito, J., dissenting). In any event,

the Court reaches the same conclusion. If the state law claims are within the Court's supplemental

jurisdiction, the Court exercises its discretion and remands those claims to state court. If the state

law claims are without the Court's supplemental jurisdiction, the Court has no subject matter jurisdiction and remands those claims to the state court.

**IV.    <u>Conclusion</u>**

For the reasons set forth above, the Court grants Defendants' motion for summary judgment (Dkt. No. 25) on Plaintiff's claims for unlawful entry under § 1983, excessive force under § 1983, and *Monell* liability under § 1983. The Court, thus denies, Plaintiff's motion for summary judgment on his claim for unlawful entry under § 1983. (Dkt. No. 27). The Court remands the remaining claims, which all arise under South Carolina state law, back to the Colleton County Court of Common Pleas.

**AND IT IS SO ORDERED.**

<u>  s/ Richard Mark Gergel  </u>
Richard Mark Gergel
United States District Judge

December 27, 2023
Charleston, South Carolina

21